# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pocono Mountain Lake Forest   :
Community Association, Inc.,   :
      Appellant   :
          :
     v.       :   No. 610 C.D. 2020
          :   Argued: December 8, 2020
John Swift, Donald McConnell,   :
David Devilliers, Lara Winkler,   :
Joseph Griger, Ed Hammond,   :
Linda White, and Ben Gardner   :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
      HONORABLE P. KEVIN BROBSON, Judge[1]
      HONORABLE CHRISTINE FIZZANO CANNON, Judge


<u>OPINION NOT REPORTED</u>


MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER       FILED: January 8, 2021


  This matter involves two competing factions of members of the Pocono Mountain Lake Forest (PMLF) residential planned community, located in Delaware Township, Pike County, Pennsylvania, each of which maintains it is the controlling board of directors. One faction is the Appellant Pocono Mountain Lake Forest Community Association, Inc. (Association), which avers Larry Floss, Samuel Mall, and Julie Evcimen were duly elected to the board and remain the legitimate board. The other faction is what has been described as the "Interim Board," comprised of

---

[1] The decision in this case was assigned to the opinion writer prior to January 4, 2021, when Judge Brobson became President Judge.

John Swift, Lara Winkler, Joseph Griger, Linda White, and Ben Gardner, which claims it assumed control after the other faction walked out of a general membership meeting on November 25, 2018.

On January 3, 2019, the Association commenced this action by filing a Complaint in the Court of Common Pleas of Pike County (trial court) against the Interim Board and three other members, Donald McConnell, David Devilliers, and Ed Hammond (collectively, Appellees), alleging they broke into Association offices, converted Association property, and are wrongfully holding themselves out as the board. Shortly thereafter, the Association filed an application for a preliminary injunction seeking to enjoin the Interim Board from: (1) holding itself out as the board; (2) acting as the board; (3) receiving mail or accepting payment of dues on the Association's behalf; (4) operating any Association bank account; (5) interfering with the operations of the "legitimate board"; and (6) removing Association property. (Application for Preliminary Injunction, Wherefore Clause.) The Association also asked the trial court to order the Interim Board to return all property including checkbooks it alleged were removed and to produce an accounting of Association funds spent, as well as to award the Association attorney's fees and costs.

Following four days of hearings on the preliminary injunction request, the trial court issued an Order on January 31, 2020, declaring all five seats on the Association's board vacant until the seats can be filled by election of Association members at a general membership meeting to be scheduled by further court order. The trial court reasoned that neither the Association nor the Interim Board had established that they were ever properly elected and/or appointed to the board and, if they were, that they were still on the board. The Association appealed this Order

2

raising one issue: whether the trial court erred and/or abused its discretion in denying its request for a preliminary injunction because the evidence establishes the Association is the legitimate board. Upon a review of the record, and in light of our highly deferential review of an order denying a preliminary injunction, we conclude there are "apparently reasonable grounds" for the trial court's action, *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003), and, accordingly, affirm the denial of the preliminary injunction.

## I.    TRIAL COURT PROCEEDINGS

Following the Association's filing of the motion for a preliminary injunction, the trial court held hearings on March 4, 2019, April 30, 2019, July 9, 2019, and October 8, 2019, at which numerous witnesses testified for each side. The trial court aptly summarized the evidence and witnesses' testimony as follows:

> The Association is governed by a set of By-Laws as most recently amended and adopted in 2015. The 2015 By-Laws provide that the [b]oard . . . shall be comprised of five (5) persons who must meet the eligibility requirements stated therein. The [b]oard shall be elected at the Fall General Membership Meeting after counting of the mail-in ballots [] by the community attorney.
>
> Elliot Gurian, [a certified public accountant,] testified he was the Association's accountant during 2018. Mr. Gurian counted the mail-in ballots for the March 2018 board of director[s] election and notified the Association of the election results. According to Mr. Gurian, [Mr.] Floss won the open seat position on the board. . . . In addition, Mr. Gurian counted the election ballots for the November 2018 general membership meeting and reported the results to the Association. According to Mr. Gurian, [Mr.] Mall and [Ms.] Evcimen were elected Treasurer and Secretary respectively and the proposed 2018/2019 budget was approved by the membership. Mr. Gurian still possesses the original election ballots for the above-noted elections and is owed an outstanding balance by the Association for his professional services.

3

[Mr.] Floss testified that he has been the President of the Association for over two (2) years. Although he submitted a resignation letter to the [b]oard . . . in 2017, he claims that the [b]oard never accepted his resignation and he later rescinded the letter of resignation. Mr. Floss estimated that approximately 45 or 46 members in good standing were present for the November 25, 2018 general membership meeting. He asserted that 46 members in good standing were necessary for a quorum. He later testified inconsistently that 34 members in good standing were present at the November 2018 meeting.

Mr. Floss denied removing any corporate records from the Association's clubhouse and asserted that some of the [Appellees] broke into the Association offices after the November 25, 2018 general membership meeting. He stated that he was in the office on November 29, 2018[,] with a constable to change the locks of the building. At that time, the locks were changed, the security cameras were reconnected[,] and the security system to the building was reset. Mr. Floss also claims that he noticed the Association's checkbook was missing on that date. He stated he has had no further access to the Association's office since November 29, 2018.

Mr. Floss claimed that, prior to the November 2018 general membership meeting, the Association maintained five (5) separate bank accounts at the Milford branch of Citizens Bank. He stated that he and Mr. Mall were the signatories on those accounts. After the general membership meeting, Mr. Floss stated that the [Appellees] closed the accounts at the Milford branch of Citizens Bank and opened five (5) separate Association accounts at the Port Jervis, New York branch of Citizens Bank.

[Mr.] Mall also claims to be an elected director of the Association. He claims that he was elected to the [b]oard at the November 25, 2018 meeting. Mr. Mall testified to the existence of video surveillance from the clubhouse's security system on November 25, 2018. . . . The surveillance video depicts events occurring after the alleged cessation of the general membership meeting. The clip shows various individuals roaming around the Association offices, opening doors and looking through desks and cabinets. The surveillance video is consistent with the chaos which ensued after the [Association]'s alleged board . . . concluded [its] version of the general membership meeting.

Mr. Mall testified that the lack of the corporate records allegedly taken by some of the [Appellees] has had a detrimental effect on the

4

Association's ability to conduct necessary business for the membership. In support of this claim, he referenced the Citizens Bank accounts being frozen or closed by the . . . [Interim Board]. Mr. Mall questioned how a new board . . . could have been voted [i]nto office after the [Association's] board left the meeting area at which time there was not a quorum present to transact Association business including election of directors.

[Ms.] Evcimen testified on behalf of the [Appellees]. [She] acknowledged being a director of the board from March 2018 until November 26, 2018. She claimed that she was not forced to resign[, as the Association alleged in its request for a preliminary injunction], but rather did not like the way Mr. Mall and Mr. Floss were running the board and thus resigned for that reason. [She] claimed that the board was operating with a lack of transparency.

Harold White attended the November 25, 2018 general membership meeting. Mr. White opined that there were about 45 or 50 people present. After the supposed meeting, Mr. White was outside of the building when he noticed someone pull up to the office and carry a box with wires and papers out of the office and put the box in his car. He described this individual as a tall slender guy with a cowboy hat. Mr. White provided no other description of this individual.

[Mr.] Swift testified that he has been the President of the Association since the November 25, 2018 general membership meeting. Mr. Swift stated that there was a full house at the general membership meeting which lasted approximately 1 ½ hours. Mr. Floss initially chaired the general membership meeting. Mr. Swift claims that he brought up a point of order at the meeting which was ignored by the then board . . . . At some point in this process, he claims that Mr. Floss began to leave the meeting area and directed his other board members to do so.

Mr. Swift also testified that he served on the board . . . in 2017 and that he accepted Mr. Floss'[s] resignation letter and a resignation letter from Darnell Chuck. He could not, however, identify any corporate records indicating acceptance of Mr. Floss'[s] resignation letter. Mr. Swift claimed that he did not leave the board, but there is no evidence to indicate that he appeared initially at the November 25, 2018 general membership meeting and participated in that meeting as a board member. He further claimed that there were no prior meetings of the board in 2018.

As a result of the chaos that ensued at the Association clubhouse on November 25, 2018, members of the Pennsylvania State Police responded to the Association's clubhouse pursuant to a call for assistance. Also present at that time were five (5) constables. The [Association]'s alleged board [members] claimed that they had to vacate the meeting area and retreat to the locked office area because of concern for their own safety. Mr. Swift claimed that the alleged prior board members, Mr. Floss, Mr. Mall[,] and Ms. Evcimen, as well as the Association accountant, were inside the locked office area for up to thirty (30) minutes.

After the [Association]'s alleged board left the building, [Ms.] White proceeded to conduct Association business at an alleged meeting of the membership. According to Mr. Swift, the business at hand continued. Those members remaining present then accepted invitations to serve on the [b]oard. . . . Five (5) members offered to serve on the [b]oard and those five (5) members were approved and installed as the [I]nterim [B]oard . . . . Mr. Swift described the people at the November 25, 2018 meeting as agitated, but that they did not make any threats to the prior board members.

Mr. Swift then testified as to the alleged new board's conducting of Association business at various board meetings after November 25, 2018. That board planned on conducting a general membership meeting on December 8, 2019.[2] That board opened two (2) bank accounts, a checking and savings account, at Wayne Bank in March 2019. Mr. Swift denies closing the previous Citizens Bank accounts of the Association. That board has presumably collected dues from property owners and made various expenditures related to the PMLF development from the bank accounts which it controls.

Mr. Swift stated that the new board had billed property owners for dues and had approximately $84,000 in one of the operating accounts for the Association. In addition, the new board had developed a budget for the Association. He estimated that 26% of the property owners had paid the dues invoices which the new board had mailed out. He also denied breaking into the Association offices and taking any checkbooks or documents of the Association. Mr. Swift did acknowledge removing the computer server from the clubhouse due to alleged security concerns. It further appears that the [Appellees] have exercised control

---

[2] The trial court's opinion says 2019, but the testimony indicates it should be 2018.

6

of the Association clubhouse and offices since the end of November 2018.

(Trial Court Opinion at 2-8.)

Based upon the evidence presented, the trial court found "that the recent past and the present administration of the [PMLF] community is mired in utter chaos, non-stop disagreement, [and] a continuing power struggle between two [] factions each claiming to be the lawful board" and each separately billing members for dues and assessments. (*Id.* at 8.) As a result, the trial court found there was "no likelihood" that the parties would be "able to rationally solve the composition of the board . . . without the [trial c]ourt's intervention." (*Id.*) Citing its broad equitable powers, the trial court found "that the animosity of the parties and the fraction of the two (2) competing groups are so severe that the only equitable or just resolution of this dispute for the property owners of PMLF is to declare all five (5) seats on the Association's [b]oard . . . as vacant and open for filling at a duly called [g]eneral [m]embership [m]eeting," which would "be scheduled by further [o]rder of the [trial c]ourt." (*Id.* at 9.)

The trial court listed multiple reasons for doing so. First, it found the Association did not establish Mr. Floss or Mr. Mall were still or ever were validly elected, as neither party demonstrated there was quorum at the March or November 2018 meetings, and Ms. Evcimen resigned on November 26, 2018. (*Id.* at 10.) Second, the trial court "note[d] that Mr. Floss and Mr. Mall displayed a poor grasp" of the Association's financial status, which was not attributable to the alleged missing records. (*Id.*) The trial court further found that Appellees, likewise, did not establish that they were properly elected or appointed, again citing the lack of a quorum. (*Id.* at 11.) Assuming there was a quorum, the trial court reasoned "there was no foundational basis, in fact or law, for the election of directors at that time"

7

based upon the Association's bylaws. (*Id.*) The trial court concluded by noting "that the property owners of PMLF have been disenfranchised by the dysfunction of the community's administration or lack thereof" and that given both sides are billing and collecting dues and assessments from members, "it would be difficult presently to determine which property owners of PMLF are in good standing and eligible to vote on Association matters." (*Id.* at 12.)

Accordingly, the trial court did not grant the requested preliminary injunction. It further declared all seats vacant until a general membership meeting was scheduled by court order. In the interim, the trial court ordered a full accounting of all funds received, disbursed, and currently held. The accounting was to be provided to the trial court at a status conference scheduled for March 4, 2020. Further, both sides were enjoined from billing property owners for dues and assessments or accepting payment of same until further order of the trial court.

The Association filed a timely notice of appeal.[3]

## II.    PARTIES' ARGUMENTS

On appeal, the sole issue raised by the Association is whether the trial court erred and/or abused its discretion in denying its request for a preliminary injunction. The Association argues Mr. Floss was elected to the board in March 2018, and Mr. Mall and Ms. Evcimen were elected at the November 25, 2018 general membership meeting. Although Ms. Evcimen resigned one day later, the Association argues the trial court erred in concluding Mr. Floss and Mr. Mall were not directors. The Association acknowledges Mr. Floss submitted a letter of resignation but contends

---

[3] The appeal was originally taken to the Superior Court, which transferred the matter to this Court by order dated March 31, 2020. Upon appeal, the trial court stayed the proceedings before it. At oral argument, the parties indicated that both factions continue to attempt to govern, conducting meetings and collecting dues, etc.

8

it was never accepted and Mr. Floss rescinded it the next day. The Association further argues that there is no evidence Mr. Floss or Mr. Mall were removed from the board through the procedure provided in the Association's bylaws. Accordingly, the Association argues that the self-appointed Interim Board lacks the authority to act on behalf of the Association. In addition, the Association asserts it satisfied the requirements for a preliminary injunction and the trial court abused its discretion by not maintaining the status quo, which was allowing the Association to continue to act as the duly-elected board.

Appellees respond as follows. The Association's allegations are unfounded and the Interim Board had to intervene. Ms. Evcimen resigned so Mr. Floss and Mr. Mall are without a quorum to conduct business. In addition, Mr. Floss resigned, and under the bylaws, once a member serving as president resigns, the member cannot hold that office again if reelected to the board. Further, contrary to the Association's assertions, Appellees point out that the Association actually received much of what it sought in its request for a preliminary injunction because the Interim Board cannot act on the Association's behalf, receive mail, operate its bank accounts, or remove property, and it must provide an accounting. According to Appellees, the trial court only needs a reasonable ground for its actions, and review of a trial court order involving a preliminary injunction is highly deferential. Here, that standard is satisfied because the Association did not prove a reasonable likelihood of success on the merits because its witnesses were unsure how many members attended the membership meeting, making it impossible to determine if a quorum was present.

The Association filed a reply brief wherein it argues that Appellees ignore the fact that after Ms. Evcimen resigned, Mr. Floss and Mr. Mall appointed a new board

9

member to fill the vacancy. It further disputes that any accounting issues are attributable to it and alleges it did establish irreparable harm.

## III. DISCUSSION

When reviewing an order granting or denying a preliminary injunction, our review is "highly deferential" and limited to whether there was an abuse of discretion. *Summit Towne*, 828 A.2d at 1000. "[W]e do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the [trial] court." *Id.* (citation omitted). A trial court has "apparently reasonable grounds" when it has found that one of the prerequisites for a preliminary injunction has not been met. *Warehime v. Warehime*, 860 A.2d 41, 46 (Pa. 2004). To be entitled to a preliminary injunction, a party must show: (1) "that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; (2) "that greater injury would result from refusing an injunction than from granting it, and concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; (3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; (4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; (5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and (6) "that a preliminary injunction will not adversely affect the public interest." *Summit Towne*, 828 A.2d at 1001.

The purpose of a preliminary injunction is "to preserve the status quo and prevent imminent and irreparable harm that might occur before the merits of the case can be heard and determined." *Lindeman v. Borough of Meyersdale*, 131 A.3d 145,

10

151 (Pa. Cmwlth. 2015). The status quo "is the last actual, peaceable . . . and . . . lawful[] noncontested status which preceded the pending controversy." *Pa. Pub. Util. Comm'n v. Israel*, 52 A.2d 317, 322 (Pa. 1947) (citation omitted).

Here, although the trial court did not make express findings related to the six prerequisites for a preliminary injunction, it is apparent from a review of the trial court's opinion that it did not believe the Association satisfied its burden, and the parties do not argue differently. The Association's argument is premised on its position that it is the proper board and that the trial court erred in concluding they were not directors and abused its discretion in not maintaining what the Association contends is the status quo, namely, the Association's continued governance. However, the problem with the Association's position is the trial court found neither the Association nor the Interim Board established it was the legitimate, duly elected board. While the Association presented testimony it asserts supports its claim, the trial court did not apparently credit this evidence. The trial court did not find "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct." *Summit Towne*, 828 A.2d at 1001. For instance, the trial court stated the Association did not establish Mr. Floss was still a director. The record reveals Mr. Floss acknowledged tendering his resignation but claimed it was rescinded before it was accepted, whereas Mr. Swift testified Mr. Floss's resignation was accepted in July 2017. (Reproduced Record (R.R.) at 144a-46a, 172a, 407a.[4]) Given the trial court's finding, it is reasonable to infer that the trial court did not credit Mr. Floss's testimony. Further, the Association

---

[4] Although Rule 2173 of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2173, requires the reproduced record to be numbered in Arabic figures followed by a small "a," the Reproduced Record here only utilizes Arabic figures. We cite to the Reproduced Record in the proper format.

requested that Mr. Floss, Mr. Mall, and Ms. Evcimen be recognized as the legitimate board in its request for a preliminary injunction. However, the Association in its own application for a preliminary injunction avers that Ms. Evcimen resigned from her position.[5] Therefore, the Association requested that the trial court do more than just restore the status quo.

Our appellate standard of review does not permit us to reweigh the evidence or make new fact findings, including credibility determinations. *Summit Towne*, 828 A.2d at 1005. We review simply "to determine if there were any apparently reasonable grounds for the action of the [trial] court." *Id.* at 1000. "[A]pparently reasonable grounds" exist when a trial court finds that at least one of the prerequisites for a preliminary injunction have not been met. *Warehime*, 860 A.2d at 46. Here, the record is replete with conflicting evidence. As a result, the trial court, understandably, did not find that the Association had met its burden, as the party seeking a preliminary injunction, "that a preliminary injunction w[ould] properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct." *Summit Towne*, 828 A.2d at 1001. Because the narrow issue before this Court is limited to whether the trial court had "apparently reasonable grounds" for its actions, *id.*, and our review of the record reveals there were, we affirm the trial court's Order denying the preliminary injunction.

---

**RENÉE COHN JUBELIRER,** Judge

---

[5] The Association alleges Ms. Evcimen was "forced" to resign, (Application for Preliminary Injunction ¶ 9(*l*), R.R. at 43a), but Ms. Evcimen herself denied this. She testified she tendered her resignation because she "didn't like the way business was being conducted by the other two [b]oard members[, Mr. Mall and Mr. Floss]." (R.R. at 382a.)

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pocono Mountain Lake Forest      :
Community Association, Inc.,      :
              Appellant      :
     :
         v.      :    No. 610 C.D. 2020
     :
John Swift, Donald McConnell,      :
David Devilliers, Lara Winkler,      :
Joseph Griger, Ed Hammond,      :
Linda White, and Ben Gardner      :

# O R D E R

**NOW**, January 8, 2021, the Order of the Court of Common Pleas of Pike County dated January 31, 2020, denying the request for preliminary injunction, is **AFFIRMED**.

 

 

                  _____

                  **RENÉE COHN JUBELIRER,** Judge